UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRONTIER ENERGY, LLC,

        Appellant/Cross-Appellee,

                                      File No.  1:12-CV-424

v.

                                        HON. ROBERT HOLMES BELL

AURORA ENERGY, LTD.,

        Appellee/Cross-Appellant.

_____/

## O P I N I O N

This matter is before the Court on an appeal of the bankruptcy court's entry of judgment in a natural gas royalty dispute, and a cross-appeal of the bankruptcy court's determination that the term "lease" in 11 U.S.C. § 365 applies to oil and gas leases.  For the reasons that follow, the Court will affirm the judgment and dismiss the cross-appeal as moot.

### I.

Appellant Frontier Energy, LLC, owns the mineral rights formerly held by North Michigan Land and Oil Company.  Appellee Aurora Energy, Ltd., is a company involved in extracting oil and gas.

In 2002, Aurora entered into an agreement with Frontier (the "Hudson Agreement") to lease a large mineral estate in Charlevoix County, Michigan.  Under the Hudson Agreement, Aurora, as lessee, agreed to lease oil and gas producing properties from Frontier, as lessor, in exchange for the payment of royalties to Frontier.  The negotiated agreement

departed from the standard State of Michigan form lease in several significant respects. The parties agreed on an initial royalty of 15% of the proceeds of sale before Payout, subject to deductions for "costs incurred by lessee for $CO_2$ removal, third party transportation, and necessary compression." (Dkt. No. 3, Attach. 1, Agreement, Ex. A, ¶¶ 5- 6.) After Payout, the parties agreed that royalties would increase from 15% to 50% depending on the price for which the gas was sold by the lessee. (*Id.* at ¶ 5.)

Gas extraction began in 2005. In June 2007, Frontier began to question Aurora's calculation of the royalty payments. In February 2008, Frontier filed a state court action against Aurora alleging breach of contract based on failure to properly compute and pay royalties. Frontier contends that Aurora underpaid it by more than $1.5 million.

In 2009, Aurora filed a Chapter 11 bankruptcy. Aurora removed the state court action to the bankruptcy court as an adversary proceeding. At the conclusion of an 11-day trial, the bankruptcy court issued an opinion and order construing the Agreement. *Frontier Energy, LLC v. Aurora Energy, Ltd. (In re Aurora Oil & Gas Corp.)*, 460 B.R. 470 (Bankr. W.D. Mich Oct 28, 2011). On February 18, 2012, the bankruptcy court entered a judgment in favor of Defendant Aurora, and against Plaintiff Frontier, and disallowed the claims filed by Plaintiff Frontier in Bankruptcy Case No. 09-08254. Frontier filed this appeal, challenging the bankruptcy court's construction of the Agreement. Aurora filed a cross-appeal of the bankruptcy court's ruling that the Agreement is a "lease" under 11 U.S.C. § 365. *See Frontier Energy , LLC v. Aurora Energy, Ltd. (In re Aurora Oil & Gas Corp.)*, 439 B.R. 674

(Bankr. W.D. Mich. Aug. 13, 2010).

## II.

On appeals from the bankruptcy court, this Court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *In re Global Technovations Inc.*, 694 F.3d 705, 714 (6th Cir. 2012) (citing *Nicholson v. Isaacman (In re Isaacman)*, 26 F.3d 629, 631 (6th Cir. 1994)). "A factual finding will only be clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Musilli*, 379 F. App'x 494, 497 (6th Cir. 2010) (quoting *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998)).

## III.

### A. Construction in Favor of Lessor (Rule of *Fagan*)

Frontier's first assignment of error concerns the bankruptcy court's construction of the Agreement. Frontier contends that the bankruptcy court erred by applying ordinary rules of contract interpretation on the issue of intent and by reserving strict interpretation in the lessor's favor only as a last resort if other interpretive aids failed.

The Michigan Supreme Court has recognized the "established rule" that "oil and gas leases are to be construed for the benefit of the lessor and against the lessee." *J.J. Fagan & Co. v. Burns*, 247 Mich. 674, 681 (1929). The bankruptcy court recognized the continued

viability of the *Fagan* rule,[1] but rejected Frontier's contention that the *Fagan* rule trumped other rules of contract interpretation. The bankruptcy court determined that the *Fagan* rule "must yield to other interpretive rules designed to ascertain the objectively manifested intent of the parties." (Bankr. Op. 15.) The bankruptcy court stated that it would first apply the applicable rules of contract interpretation cited by Michigan courts involving controversies between parties to oil and gas leases, such as trade usage and/or course of performance, and then, only if these interpretative aids failed, would it resolve ambiguities in favor of Frontier as lessee. (Bankr. Op. 15.)

When discussing and applying the *Fagan* rule, Michigan courts have uniformly noted that other contract interpretation rules still apply. *See, e.g., McClanahan Oil Co. v. Perkins*, 6 N.W.2d 742, 743 (Mich. 1942) (noting that the ordinary rules of construction of contracts govern oil and gas leases, except that ambiguities are strictly construed in favor of the lessor); *Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 892 (Mich. Ct. App. 1997) (noting that nothing in *Fagan* purported to abolish general precepts of contract construction).

Frontier agrees that other contract interpretation rules apply to oil and gas leases, but objects to the bankruptcy court's use of the *Fagan* rule as a rule of last resort. Frontier

---

[1] *See, e.g., Mich. Wis. Pipeline Co. v. Mich. Nat'l Bank*, 324 N.W.2d 541, 544 (Mich. Ct. App. 1982) ("In construing an oil and gas lease, this Court is guided by the Supreme Court's decision in *J J Fagan & Co. v. Burns*, 247 Mich. 674, 226 N.W. 653, 67 A.L.R. 522 (1929).")

contends that the *Fagan* rule should be integrated with other indicia of the parties' intent.

There can be no dispute that "'[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties.'" *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 456 (Mich. 2003) (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). In *Klapp,* the Michigan Supreme Court held that the rule of *contra proferentem* (requiring that ambiguities be construed against the drafter) was a rule of last resort. The rule of *contra proferentem* does not aid in determining the parties' intent. *Id.* at 456. "[T]his rule is only to be applied if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the jury unable to determine what the parties intended their contract to mean." *Id.* at 455. It is not a rule of interpretation, but a rule of legal effect; its purpose is not to give meaning to the contract, but to ascertain the winner and the loser in connection with a contract whose meaning is unclear, even after application of conventional rules of interpretation. *Id.*

The Michigan Supreme Court did not discuss *Fagan* or oil and gas leases in *Klapp.* Nevertheless, *Klapp* makes a strong case for trying to discern the intent of the parties first, and to only consider the party's status as drafter if the parties' intent cannot be discerned. The *Fagan* rule, like the rule of *contra proferentem*, is a rule based on the party's status as lessor. Like the rule of *contra proferentum*, it is not designed to discern the parties' intent, and should only be applied as a tie-breaking rule. *See Lomree, Inc. v. Pan Gas Storage, LLC*, No. 10-14425, 2011 WL 3498131, at *9 (E.D. Mich. Aug. 10, 2011), *rev'd on other grounds*, No.

5

11-2132, 2012 WL 3871882 (6th Cir. Sept. 6, 2012) ("*J.J. Fagan* affirmed that *contra proferentem* is applicable in oil and gas leases, essentially re-stating the rule by declaring that oil and gas leases are to be construed 'for the benefit of the lessor and against the lessee.'").

The bankruptcy court's approach of first applying applicable rules of contract interpretation to determine the parties' intent, and resolving ambiguities in favor of Frontier as lessor only if those interpretive aids failed, is consistent with Michigan case law.  In *Schroeder*, the Michigan Court of Appeals recognized that "ambiguities in the oil and gas lease should be resolved in favor of the lessors as a policy matter." 565 N.W.2d at 892.  The court nevertheless rejected the lessor's interpretation of the disputed contract phrase and adopted the lessee's interpretation because it "better conform[ed] with the parties' intent as gleaned from the contractual language." *Id.* at 892, 894.  In *Lomree,* the Eastern District of Michigan recognized its duty to construe gas leases for the benefit of the lessor.  2011 WL 3498131, at *4.  The court nevertheless commenced its interpretation of a gas lease by reaffirming its obligation to enforce a contract according to the parties' intent, and only applied the rule of *contra proferentem* in favor of the lessor  when, "after applying all other conventional means of contract interpretation," the terms were still ambiguous.  *Id.* at *5.  On appeal, the Sixth Circuit did not reverse the methodology used by the district court in determining that the contracts were ambiguous.  2012 WL 3871882, at *7.  The Sixth Circuit reversed because the district court applied the doctrine of *contra proferentum* while there were still unresolved issues of fact concerning the parties' intent:  "The doctrine requires

6

construing a contract against the drafter . . . when the parties' intent is still unclear after reviewing all the evidence. But because it is too early to say what weight a reasonable fact finder might place on the extrinsic evidence offered by Lomree, summary judgment in favor of Lomree was inappropriate in this case." *Id.* (citation omitted).

The Court concludes on review that the bankruptcy court did not err in the manner in which it applied the rule of *Fagan*.

## B. Determination re ambiguous and unambiguous terms

Frontier also contends that the bankruptcy court erred in its determination of which contract terms were ambiguous and which contract terms were unambiguous.  The Agreement provided that the royalty was subject to deductions for "costs incurred by lessee for $CO_2$ removal, third party transportation, and necessary compression."   (Dkt. No. 3, Attach. 1, Agreement, Ex. A, ¶¶ 5- 6.)  Throughout the parties' relationship, Aurora used the services of HPPC to transport all of Aurora's gas.  HPPC was a subsidiary of Aurora.  During the life of the Agreement, Aurora's ownership in HPPC steadily grew from 48.5% in 2004, to 100% in 2009.  *Frontier*, 460 B.R. at 477-78.  The bankruptcy court determined that the term "third party transportation" was not ambiguous, and that HPPC qualified as third party transportation.   *Id.* at 484.

Frontier contends that the bankruptcy court erred both in its determination that "third party transportation" was not ambiguous and in its determination that transportation provided by HPPC, a subsidiary of Aurora, qualified as third party transportation.   Frontier contends

7

that the bankruptcy court should have found, based on the extensive extrinsic evidence offered by Frontier, that the term "third party" presents a latent ambiguity in the context of this case.

"A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (internal quotations omitted). "To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue." *Id.*

The bankruptcy court began its analysis by noting that the "plain and ordinary meaning" of "third party" is someone other than the principals involved in a transaction. *Frontier*, 460 B.R. at 483. The bankruptcy court acknowledged that although Aurora's business and legal interests were closely intertwined with HPPC, Aurora and HPPC were separate corporate entities. The bankruptcy court further noted that elsewhere in the Agreement the term "independent nonaffiliated third party" is used, which confirms that the parties knew how to distinguish related and unrelated third parties. *Frontier*, 460 B.R. at 483. Because the parties used the unmodified term "third party" in the royalty section, the

8

bankruptcy court determined that it was proper to construe the term "third party" according to its ordinary meaning. *Id.* The bankruptcy court permitted Frontier to present extrinsic evidence, but ultimately found that there was no latent ambiguity, in part because it found that the testimony of David and Dale Nielson regarding contract negotiations was not credible. *Id.* at n.5. This Court agrees with the bankruptcy court's determination that the contract was not ambiguous and that HPPC qualified as "third party transportation."

**C. Mich. Comp. Laws § 324.61503b**

Frontier contends that the bankruptcy court erred when it rejected the application of Mich. Comp. Laws § 324.61503b to the Payout clause.

The Michigan Natural Resources and Environmental Protection Act provides in part that:

> (1) A person who enters into a gas lease as a lessee after March 28, 2000 **shall not deduct from the lessor's royalty any portion of postproduction costs unless the lease explicitly allows for the deduction of postproduction costs**. If a lease explicitly provides for the deduction of postproduction costs, the lessee may only deduct postproduction costs for the following items, unless the lease explicitly and specifically provides for the deduction of other items:
>
> (a) The reasonable costs of removal of carbon dioxide ($CO_2$), hydrogen sulfide ($H_2S$), molecular nitrogen ($N_2$), or other constituents, except water, the removal of which will enhance the value of the gas for the benefit of the lessor and lessee.
>
> (b) Transportation costs . . . .

Mich. Comp. Laws § 324.61503b(1) (emphasis added).

Consistent with the statute, the Agreement states that Lessor's royalty is to be free and

clear of all costs "except as agreed herein." (Dkt. No. 3, Attach. 1, Agreement ¶ C(2)(g), Page ID#3723.) In a separate section the Agreement provides that Frontier's royalty would be determined based on a two-tiered royalty structure: a 15% royalty on production before Payout and a higher royalty of 15% to 50% after Payout. Payout was defined as that point in time at which Aurora had recouped its investment.[2] In calculating whether Payout had been reached, Aurora deducted postproduction costs from "proceeds of production." Frontier contends that by deducting postproduction costs from the proceeds of production, Aurora delayed the occurrence of Payout, thereby reducing the royalty payments owed to Frontier. At trial, Frontier argued that because the Payout clause affects the royalty payments, the statute prohibiting the deduction of postproduction costs governed the calculation of Payout under the Payout clause. Aurora argued that the statute did not apply to the Payout clause because the statute applies to "royalties" and not to "Payout."

---

[2] "Payout" is defined in the Agreement as follows:

For purposes of this paragraph, the term "Payout", with respect to a given Antrim Unit, shall mean the point in time that the **proceeds of production** attributable to the interest of the lessee in all wells drilled upon the Antrim Unit, less royalties and other lease burdens and production or similar taxes, **equals the costs incurred by lessee** for drilling, testing, completing and equipping all wells, constructing and installing all necessary gathering lines, facilities and pipelines, including meters, plus the cost of operating the Antrim Unit prior to Payout. Payout for royalty determination purposes shall be deemed to have occurred as of the first day of the calendar month succeeding the month in which payout occurs.

(Dkt. No. 3, Attach. 1, Agreement, Ex. A, ¶ 5 (emphasis added).)

After noting that statutes in derogation of the common law were to be narrowly construed and that the somewhat unusual concept of Payout is not addressed within the text of the law, the bankruptcy court declined to "stretch" the statutory language as far as Frontier's "novel argument would take it."  460 B.R. at 488-89.

The bankruptcy court found that the phrase "proceeds of production" as used in the Payout clause meant proceeds of sale minus postproduction costs, and that Aurora's deductions of postproduction costs in calculating Payout was consistent with the Agreement. 460 B.R. at 491.  On appeal, Frontier does not contest the finding that the  parties intended that postproduction costs would be deducted from Aurora's revenue in the calculation of payout.  Instead, Frontier contends that the statute overrides the parties' intent, and that because the statute is remedial in nature, the statute should have been liberally construed. *See W. Mich. Univ. Bd. of Control v. State*, 565 N.W.2d 828, 834-35 (Mich. 1997).

The statute only prohibits the deduction of postproduction costs from the lessor's royalty.  Mich. Comp. Laws § 324.61503b(1).  Even if this Court assumes that the statute is remedial in nature,[3] the canon of liberal construction does not authorize the court to ignore the parameters established by the plain text of the statute.  *See Unisys Corp  v. Comm'r of Ins.*, 601 N.W.2d 155, 159 (Mich. Ct. App. 1999).  Even under a liberal construction of the statute, the statute simply does not address the determination as to when payment of a royalty

---

[3]Although the legislative history was silent on this point, the bankruptcy court noted that "Michigan's legislature may have intended to address a specific oil and gas lease drafting problem" by overruling *Schroeder* with this statute.  460 B.R. at 488.

11

might be triggered. In this case, two sophisticated parties entered into an agreement that provided for royalty payments consistent with the statutory requirements. The same sophisticated parties also agreed that a higher royalty would be paid after Aurora's proceeds of sale minus postproduction costs equaled its investment. The bankruptcy court was correct in its determination that the statute did not prohibit such an agreement.

## D. Course of Performance

Frontier contends that the bankruptcy court erred as a matter of law in its understanding and application of the parties' course of performance practical construction of the Agreement. Frontier contends that because Aurora repeatedly changed the manner in which it reported its calculation of royalties throughout the life of the contract, there was no acquiescence by Frontier, nor any course of performance that could be relied on for determining the meaning of ambiguous terms such as "ownership percentages," "proceeds of production," "costs incurred by lessee," "necessary compression," and "overhead." Frontier also contends that the bankruptcy court was inconsistent in its application of the parties' course of conduct, sometimes finding that Aurora's conduct was evidence of Aurora's understanding of the contract's terms, but at other times excusing Aurora's consistent conduct as an accounting mistake. Frontier contends that the bankruptcy court's inconsistency confirms that it fundamentally misapplied the concept of practical construction, and undermines its reasoning with regards to the purported significance of the parties' purported practical construction.

"Michigan law provides that the parties' practical interpretation of their contract, and their course of conduct under that contract, are entitled to great weight in interpreting ambiguous provisions of the contract." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 180 (6th Cir. 1996). "The practical interpretation given to contracts by the parties to them, while engaged in their performance and before any controversy has arisen concerning them, is one of the best indications of their true intent." *Klapp*, 663 N.W.2d at 459. Although Frontier attempts to present its argument as one of law, as a general rule, the bankruptcy court applied the parties' course of conduct to determine their intent, and disputed issues of contractual intent are considered to be factual issues. *Terry Barr Sales*, 96 F.3d at 179. Frontier has not identified any evidence to show that the bankruptcy court's factual findings were clearly erroneous.

Upon review, it appears that the bankruptcy court made detailed factual findings in support of its determinations regarding the intent of the parties with respect to each of the disputed terms. The bankruptcy court explained that it sided with Aurora in many instances because it found Aurora's witnesses more credible. There is evidence in the record to support the bankruptcy court's credibility findings and its findings with respect to the parties' course of performance. This Court is not left with a definite and firm conviction that a mistake has been committed. Accordingly, the bankruptcy court's findings are not clearly erroneous. *See In re Musilli*, 379 F. App'x at 497. Furthermore, the Court finds that the bankruptcy court's failure to apply the course of performance doctrine to every instance of

13

past performance is evidence of its thoughtful application of the doctrine based on the relevant facts rather than a misapplication of the doctrine.

### IV.

Aurora contends in its cross-appeal that the bankruptcy court erred in ruling that the Agreement was a lease for purposes of 11 U.S.C. § 365.  However, Aurora has indicated that its cross-appeal is conditional, and that if this Court affirms the bankruptcy court's opinion on the royalty issues, the Court does not need to reach the § 365 lease issue because it will not affect the outcome of the case.  (Dkt. No. 21, Aurora's Br. 35-36.)

Because the Court is affirming the bankruptcy court's opinion on the royalty issues, the cross-appeal has been rendered moot.

An order and judgment consistent with this opinion will be entered.


Dated: March 27, 2013                            /s/ Robert Holmes Bell
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE


14